**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* WESLEY SNIPES | **Case No.** ___3:16-cv-647-JFA___ |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *et seq.* |
| v. | |
| QZO, INC. d/b/a PALMETTO AMBULANCE SERVICES | **FILED UNDER SEAL** |
| Defendants. | **JURY TRIAL DEMANDED** |

### INTRODUCTION

1.  *Qui tam* relator Wesley Snipes ("Relator" or "Snipes"), by and through his attorneys, individually and on behalf of the United States of America, files this Complaint against QZO, Inc. d/b/a Palmetto Ambulance Services ("Palmetto") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA").

2.  This case concerns an ambulance provider that bills Medicare and Medicaid for services it is not equipped to provide, engages in rampant regulatory violations by falsifying documentation, and collects from Medicare and Medicaid millions of dollars of public money for services that are not covered by the programs.

3.  Medicare and Medicaid are Government funded programs that fund medical services, including ambulance transportation services, provided to their beneficiaries. Medicare beneficiaries are mostly individuals over the age of 65, and Medicaid beneficiaries are mostly

indigent. South Carolina Medicaid is run by the State, but 70% of the South Carolina Medicaid program is funded by the Federal Government.

4.     Defendant Palmetto is a provider of emergency and non-emergency ambulance transportation, and health care services.  Defendant engages in several schemes in efforts to defraud the Federal Government for the purposes of collecting higher Medicare and Medicaid reimbursement funds for services that do not meet the Center for Medicare and Medicaid Services ("CMS") requirements.

5.     First, Defendant violates applicable Medicare reimbursement law and guidelines by manipulating and falsifying medical certification forms and submitting them to Medicare for reimbursement.

6.     Second, Defendant violates applicable Medicare reimbursement law and guidelines by repeatedly failing to meet Medicare's standards for ambulance vehicles.

7.     Third, Defendant violates applicable Medicare reimbursement law and guidelines by billing Medicare for Advanced Life Services ("ALS"), despite the fact that Defendant is not equipped to provide ALS services.

8.     Relator Snipes worked at Palmetto from spring 2014 through September 18, 2015 and observed Defendant's fraudulent conduct.  Snipes worked, first, as an EMT paramedic for the company, and later as a quality supervisor.  During his stint as quality supervisor, Relator raised concerns about Defendant's fraudulent billing to the Government and about providing services with less than adequate equipment, and he was terminated shortly thereafter.

9.     Defendant is liable to the Government for the damages they have caused through their fraudulent practices and is further liable for all other awards and penalties available under

2

the federal False Claims Act.  Moreover, Relator is entitled to recovery for Defendant's

retaliation against him.


## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

and 31 U.S.C. § 3732(a).

11.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. §

3732(a) because Defendant transacts business in the judicial district.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(c) and 1395(a), and 31

U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district and

Defendant transacts business within this judicial district.


## PARTIES

*Relator Wesley Snipes*

13.     Snipes has twenty-five years of experience in the ambulance and medical

transport industry.  Snipes has an EMT-Intermediate certification, which allows him to be a mid-

level provider of prehospital medical services. Snipes began working for Palmetto in the spring

of 2014, initially as an EMT paramedic, and later as a quality supervisor.  Snipes was based out

of Palmetto's Rock Hill office in South Carolina.

14.     Snipes brings this action, other than with respect to his retaliation claims, on

behalf of the United States of America.  He is an original source of the information provided in

this Complaint.

15.     Before starting work for Palmetto, Snipes worked full time as an EMT and hospital driver for Piedmont Medical Center from approximately 1999-2013.  Piedmont is a hospital based in Rock Hill, SC.

16.     After Piedmont, Snipes worked as an EMT and hospital ambulance driver for Carolina Health Care System, a network of community hospitals throughout North and South Carolina.  As an EMT and hospital driver, Snipes was responsible for answering calls for both emergency and non-emergency transports.  Dispatches came to the hospital through a 911 service, which would dispatch the hospital's ambulance and EMTs.  The patient's condition was often the determining factor of the patient's destination.  Snipes worked at Carolina Health Care System for approximately eight months.

17.     In or about the spring of 2014, when Snipes was still working for Carolina Health Care System, Snipes received a call to help save Jacob Funderburke's ("Funderburke") life.  Funderburke, Snipes' friend's father, offered Snipes a job at Palmetto after Snipes saved Funderburke's life.  Funderburke worked at Palmetto as a supervisor for over four years.

18.     In or about the spring of 2014, Snipes joined Palmetto and worked as an EMT paramedic and quality supervisor.  Snipes worked out of Palmetto's Rock Hill office, which operates seven ambulances and three wheelchair units.  Funderburke was Snipes' supervisor at Palmetto.

19.     Snipes had a short stint as quality control officer for Palmetto, a demotion from his role as medic to a more administrative role.  In this position, Snipes had access to the paperwork of all the drivers in the Rock Hill office, and he witnessed problematic behaviors.

20.     During his time at Palmetto, Snipes' relationship with Funderburke soured, as Snipes witnessed, and complained about, fraudulent practices.  Among the problems Snipes had

with Palmetto's practices were altering call logs, forging papers, and sending poorly maintained vehicles on the road.

21.     On or about September 18, 2015, Palmetto terminated Snipes' employment.

### Defendant QZO, Inc., d/b/a Palmetto Ambulance Services

22.     Defendant Palmetto was founded in 1994 and is one of the largest private providers of emergency medical services in South Carolina.[1]

23.     Palmetto is a provider of emergency and non-emergency ambulance transportation and health care services.

24.     Palmetto's National Provider Identifier ("NPI") is # 1417957705.  Palmetto's South Carolina License is #028.  Palmetto's SC Medicaid Number is #AB0188.

25.     In 2012, Medicare reimbursed Palmetto nearly $4,930,000, ranking them second in the state, out of 73 medical transportation providers in South Carolina.

26.     Palmetto has multiple office locations.  Its corporate office is in Augusta, GA, and the rest of Palmetto's offices are spread throughout South Carolina: Aiken, Columbia, Greenville.

27.     Snipes worked out of Palmetto's Rock Hill location, which is not listed on Palmetto's website, located at 149 W Black Street, Rock Hill, SC 29730.  The manager of Palmetto's Rock Hill location is Funderburke.

28.     Palmetto's Rock Hill location receives over one hundred transport calls per week.

29.     Palmetto has between 125-140 employees, with approximately 25-30 employees per location.

---

[1] http://palmettoambulance.com/our_story.html

30.    Palmetto's fleet of vehicles consists of approximately 83 ambulances and wheelchair vans, with an estimated combined value of $500,000.

31.    Palmetto's Chief Executive Officer and President is Keith Stille.

32.    Palmetto's Chief Operating Officer is Tom Stille.

**FACTUAL ALLEGATIONS**

**I.    MEDICARE AND MEDICAID PROGRAMS**

33.    The Medicare program was established under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395iii.  It is a federal health insurance program that pays for covered medical care provided to eligible aged and disabled persons.  Coverage under the Medicare program is divided into "parts."  Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services, hospital outpatient services and certain ambulance services.  *See* 42 U.S.C. §§ 1395k, 1395m, 1395x.

34.    CMS administers the Medicare program and establishes the requirements for payment.

35.    Medicaid is a Government health insurance program for the poor that is jointly funded by the Federal and State Governments.  *See* 42 U.S.C. §§ 1396, *et seq.*  Each State administers its own Medicaid program, and in South Carolina, the program is called Healthy Connections.

36.    The Federal Government contributes approximately 70% of the funding for the Healthy Connections program.

37.    CMS provides reimbursements to ambulance providers for transporting Medicare beneficiaries in certain circumstances.

### a. Applicable Medicare Reimbursement Laws and Applicable Medicare Guidelines for Vehicle Requirements.

38.     CMS requires that ambulances for Basic Life Services ("BLS") be staffed by at least two people, and that at least one of the two be certified as an EMT by the State or local authority where the services are being furnished, and be legally authorized to operate all lifesaving and life-sustaining equipment aboard the vehicle.  CMS Medicare Benefit Policy Manual, Ch. 10 – Ambulance Services, 10.1.1, 10.1.2.

39.     Similarly, CMS requires that ALS vehicles be staffed by at least two people, at least one of whom must be certified by the State or local authority as an EMT-Intermediate or an EMT-Paramedic.  *Id.*

### b. Applicable Medicare Reimbursement Laws and Applicable Medicare Guidelines for Medical Certification Forms.

40.     CMS requires non-emergency ambulance services be medically necessary for reimbursement.  To prove such medical necessity, physicians are required to complete a certification statement, a checklist filled out by a physician, a nurse, or a discharge planner to justify the non-emergency services.  42 C.F.R. § 410.40(d)(2).

41.     CMS states that medical necessity is established when the patient's condition is such that any other means of transportation is contraindicated.  In all cases, appropriate documentation must be kept on file, and upon request, presented to the insurance carrier or intermediary.  CMS Medicare Benefit Policy Manual, Ch. 10 – Ambulance Services, 10.2.1.

42.     CMS reimburses providers for services according to the level of the service provided (assuming it is medically necessary), not simply on whether an ambulance is used.  CMS Medicare Benefit Policy Manual, Ch. 10 – Ambulance Services, 10.2.2.

c. **Applicable Medicare Reimbursement Laws and Applicable Medicare Guidelines for Basic Life Services and Advanced Life Services**

43.     CMS defines BLS services as transportation by ground ambulance vehicle and the provision of medically necessary supplies and services, including BLS ambulance services as defined by the State.  The ambulance must be staffed by an individual who is qualified in accordance with State and local laws as an emergency medical technician basic ("EMT-Basic"). These laws may vary from State to State or within a State. For example, only in some jurisdictions is an EMT-Basic permitted to operate limited equipment onboard the vehicle, assist more qualified personnel in performing assessments and interventions, and establish a peripheral intravenous (IV) line.

44.     South Carolina's definition of BLS ambulance services is:

a.  Must have ambulances that meet the regulations of SC Department of Health and Environmental Control.

b.  Must have at least 5 EMTs associated with the provider.

c.  Must have staffing patterns, policy and procedure, and mutual aid agreements to assure that an ambulance can be en route within five minutes of an emergency call.

45.     CMS defines ALS services as performed by an ALS crew as part of an emergency response that is necessary because the patient's reported condition at the time of dispatch was such that only an ALS crew is qualified to perform the assessment.

46.     The determination to respond emergently with an ALS ambulance must be in accord with the local 911 or equivalent service dispatch protocol.  Where the dispatch is inconsistent with this standard of protocol, including where no protocol was used, the

8

beneficiary's condition (for example, symptoms) at the scene determines the appropriate level of payment.

47.    In short, ALS ambulances transport patients who need a higher level of care than those provided by a BLS ambulance.  Patients who typically require ALS transportation usually also need one or more of the following: continuous IV medicine; a cardiac monitor; defibrillators; medications, advanced air equipment; ALS assessment (performed by an ALS crew as part of an emergency response necessary because of the patient's reported condition at the time of dispatch); ALS intervention (procedure required to be done by an EMT-Intermediate or EMT paramedic).

## II.    SOUTH CAROLINA'S REGULATIONS FOR EMERGENCY MEDICAL SERVICES

48.    Under South Carolina's regulations, emergency ambulance transports are defined as:

> Services and transportation provided after the sudden onset of a medical condition manifesting itself by acute symptoms of such severity, including severe pain, that the absence of medical attention could reasonably be expected to result in the following:
>
> a.    Placing the patient's health in serious jeopardy;
>
> b.    Causing serious impairment to bodily functions; or
>
> c.    Causing serious dysfunction of bodily organ or part;
>
> d.    A situation that resulted from an accident, injury, acute illness, unconsciousness, or shock, for example, required oxygen or other emergency treatment, required the patient to remain immobile because of a fracture, stroke, heart attack, or severe hemorrhage.

S.C. Code Ann. Regs. 61-7 § 201(H) (2016).

49. Under South Carolina's regulations, non-emergency ambulance transports are defined as:

> Services and transportation provided to a patient whose condition is considered stable. A stable patient is one whose condition reasonably can be expected to remain the same throughout the transport and for whom none of the criteria for emergency transport has been met. Prearranged transports scheduled at the convenience of the service or medical facility will be classified as a nonemergency transport.

S.C. Code Ann. Regs. 61-7 § 201(Q) (2016).

50. South Carolina's Department of Health and Environmental Control outlines the criteria necessary to be categorized as a provider of ALS:

> The provider must meet all criteria established for basic life support, minimum standard. Additionally, the provider must demonstrate sufficient equipping and staffing capability to assure that life support consisting of IV therapy, advanced airway care, cardiac monitoring, electrical therapy and drug therapy, approved by the Department and the unit medical control physician, are onboard the ambulance with a minimum of two EMT's, one of which must be an EMT-Paramedic at least 80% of the time on emergency calls. For initial applicants seeking licensure with no prior call history, category shall be determined by the Department on a case by case basis.

S.C. Code Ann. Regs. 61-7 § 405 (2016).

51. South Carolina's Healthy Connections defines a medically necessary service as a service (the provision of which may be limited by specific manual provisions, bulletins, and other directives) that is directed toward the maintenance, improvement, or protection of health or toward the diagnosis and treatment of illness or disability. Further, the State requires that the provider's medical records and any other documentation for each beneficiary substantiate the need for services.

52.    South Carolina's Department of Health and Environmental Control also delineates the requirements for formatting, completion, maintenance and handling patient forms. *See* S.C. Code Ann. Regs. 61-7 §§ 1301-03 (2016).

## III.    DEFENDANT QZO, INC., D/B/A PALMETTO'S AMBULANCE SERVICES

53.    Palmetto provides ambulance services for patients, including beneficiaries of the Medicare and South Carolina Medicaid program.

54.    Palmetto's most common transports are for dialysis patients, who are transported on a non-emergency, scheduled, basis to and from dialysis treatment centers.  Palmetto also transports patients to and from patients' homes, hospitals, special care clinics, orthopedic offices, and general physicians.

55.    Palmetto operates ambulance services five days a week from 4:00 a.m. until 6:00 p.m. and has been operating since 1994.  According to its website, Palmetto provides services to over 40,000 patients statewide.

56.    Palmetto uses LogistiCare to schedule and bill about half of the services it provides to Medicare and Medicaid.  LogistiCare requires that Palmetto, and other companies, comply with LogistiCare certifications.

57.    Most of Palmetto's patients from the Rock Hill area are from nursing homes, particularly Agape Senior Assisted Living, with locations in Piedmont, Midlands, Grand Strand, Pee Dee, and Lowcountry.

58.    Palmetto's Rock Hill's EMTs regularly pick up and drop off patients from Agape's Piedmont location.

59.    Other regular destinations for Palmetto's Rock Hill location are White Oak Manor in Rock Hill and Pruitt Health-Rock Hill.

### IV.    FALSIFICATION OF MEDICAL CERTIFICATION FORMS

60.    Upon picking up patients from hospitals, clinics, orthopedic offices, or general physicians, Palmetto EMT paramedics must obtain "certification forms," the forms indicating medical necessity, in order to qualify for CMS reimbursement.

61.    When Palmetto EMT paramedics first receive the certificate of medical necessity form, it is already signed and filled out by one of five individuals: the patient's physician, physician's assistant, clinical nurse specialist, registered nurse, or discharge planner.

62.    The first question on the certification form is whether the patient was bed-confined, or unable to ambulate.  If a patient is ambulatory, or not bed-confined, then he can get up from bed or stretchers by himself.

63.    According to the CMS guidelines, medical necessity is established when the patient's condition is such that any other means of transportation is contraindicated.  In other words, a patient has medical necessity for non-emergency ambulance services when the patient is not ambulatory.

64.    Since most of Palmetto's patients are ambulatory, physicians leave the first question un-checked, indicating that the patient is not bed-confined.

65.    After leaving the medical facilities, EMT paramedics are instructed by Palmetto's managers to falsify the medical certification forms by adding a check, *after* the physician has already signed the form, to the first question on the form to indicate that the patient is non-ambulatory, even if the patient is ambulatory.

12

....... Transportation

**24/hr Dispatch:  800-648-4999**                    **Fax to:  888-293-0904**

Medicare requires via *42CFR Part 410.40 (d)(2)* that Palmetto Ambulance obtain a Physicians Certification Statement signed by a physician *prior* to providing any non-emergency ambulance transportation.

| Section 1-Beneficiary Information |
|---|

Name: _____          Date of Transport: _____

SSN: _____          DOB: _____

Medicare # : _____          Medicaid # : _____

| Medical Necessity Information |
|---|

☐ Bed confined, i.e., unable to get up from bed without assistance; unable to ambulate; and unable to safely sit in chair or wheelchair

☐ Requires trained monitoring for: cardiac monitor, IV monitoring, airway management or monitoring (ventilator dependent, suction)

☐ Patient has been Medicated or Sedated prior to transport

☐ Patient requires constant Oxygen with third party assistance needed to apply, administer, or adjust en route

☐ Patient has End Stage Renal Disease requiring dialysis treatment

☐ Patient is severe Diabetic (IDDM) requires monitoring

☐ Patient has Metastatic Cancer requiring Chemotherapy or Radiation treatment

☐ Must remain immobile due to a visual deformity and/or confirmed fracture

☐ Contracted and CANNOT sit up in wheelchair

☐ Severe pain aggravated by transfers and requires trained personnel

☐ Unable to sit or hold self in place, even with seatbelts, due to Paralysis

☐ Severe total body weakness, can not control body movements

☐ Has decubitus ulcers and requires wound precautions. ____buttocks____ sacral____ back____ hip ____ feet

☐ Frail, debilitated, extreme muscle atrophy, risk of falling out of wheelchair while in motion

☐ Patient is at risk of injury or bleeding if not transported be stretcher and EMT professionals

☐ Morbid Obesity requires additional personnel/equipment to handle weight, exceeds wheelchair safety limit

☐ Confused, Combative, Lethargic, or Comatose

☐ Patient is seizure prone and requires monitoring

☐ Severely decreased level of consciousness and/or altered mental status

☐ Debilitated Post-Op recovery

☐ Transport to Rehabilitation Hospital following CVA, Stroke, MI, Multi site Trauma

☐ Other Medical History: Why Stretcher Required
(Explain) _____

\* Check all that apply

| Section 3- Authorization |
|---|

I certify the information in Section 2 above represents an accurate assessment of the beneficiary's medical condition and that ambulance transportation is medically necessary.

| Printed Name of Physician | Signature | Date |
|---|---|---|
| Discharge Planner, RN, Nurse Practitioner, PA or Clinical Nurse Specialist | Signature | Date |

**Figure 1. Certification Form**

66.     For example, Patient 1 is a dialysis patient.  Snipes picked Patient 1 up from his home in Lancaster, SC, to a DaVita dialysis clinic approximately three miles away.  Patient 1 is clearly an ambulatory patient and has no problems to move independently.  However, Palmetto checks off the non-ambulatory field on the certification form for transport and billing to CMS, even though that did not meet Patient 1's condition.

67.     Another example is Patient 2, a nursing home patient who requires a wheelchair. However, Palmetto often transports Patient 2 on a stretcher when driving her from the nursing home in Rock Hill to a dialysis center in Fort Mill, approximately thirteen miles away.  Utilizing the stretcher, even though Patient 2 does not need one, also prompts Palmetto to check the non-ambulatory field on the certification form for transport and billing to CMS, even though that did not meet Patient 2's condition.  Checking the non-ambulatory field to describe the patient makes the service seem as though it was medically necessary.

68.     Checking this field increases Palmetto's chances of being reimbursed by CMS because it suggests that the service rendered was medically necessary.

69.     Medical facilities do not keep copies of the medical certification forms.  The forms are submitted to CMS.

70.     Snipes witnessed the falsification of these certification forms for billing purposes first-hand when he worked as Quality Control Officer for Palmetto.  Snipes remembered the patients, and he knew that some patients were ambulatory, yet their certification forms indicated that the patients were not ambulatory.  Snipes also performed transports, and he brought the certification form with an empty checkbox next to the non-ambulatory field, but he then saw the paperwork was altered.

71.     During his time as Quality Control Officer, Snipes also saw that patient healthcare records are left out unsecured in public view.  Snipes also saw that patient documents are stored informally in a basket on the desk in the front office.  Additionally, staff in the billing office do not have the necessary authorization to view electronic patient records because they are not managers, but they view them anyway, using one of Palmetto's Rock Hill managers Kelly Pour's account information.

72.     During his time as Quality Control Officer, Snipes also learned that other Palmetto staff entered account information into the billing system that was inaccurate.  For example, one call record indicated that Snipes and Funderburke were on a transport together, but Snipes was on a different transport at the time listed on the record.

## V.    PALMETTO'S FAILURE TO MEET VEHICLE STANDARDS

73.     Palmetto works with LogistiCare, a nationwide transportation network management system, to schedule and bill about half of Palmetto's work to CMS.

74.     As a condition for participation, Logisticare inspects Palmetto's vehicles to ensure they meet Logisticare's safety requirements.

75.     On several occasions, Logisticare declared that some of Palmetto's vehicles were unfit for driving and required Palmetto fix them before sending the vehicles back on the road. Palmetto's vehicles have malfunctioning GPS devices, broken windshields, seatbelt violations, and expired insurance and tags.

76.     Palmetto ignores Logisticare's directives and sends the ambulances back on the road without mending the problems to comply with Logisticare's criteria.

77.     Palmetto also has wheelchair vans, which are often assigned to Palmetto drivers who do not have LogistiCare certification.  LogistiCare requires that wheelchair vans be driven

by drivers who are LogistiCare-certified.  To cover this up, Palmetto completes the paperwork

with the names of certified drivers, even though the non-Logisticare certified drivers performed

the trip.

78.     Palmetto knowingly dispatches non-certified drivers to drive four to six of the ten

wheelchair vans.  Palmetto dispatches two or three vans per day to run between eight to twelve

wheelchair dispatches per day.

79.     Most patients who call for wheelchair vans are covered by Medicare.

## VI.     INADEQUATE EQUIPMENT FOR ADVANCED LIFE SERVICES

80.     Despite not having a valid license to provide ALS transport to patients, Palmetto

bills CMS for providing BLS and ALS transport.

81.     Palmetto does not have a valid ALS license because it is not equipped with the

required components of ALS-vehicles.

82.     Palmetto determines whether to bill for ALS or BLS at the time the call comes in,

not when the services call is made at the time the call comes in, not what services are actually

provided.

83.     Palmetto has staff that is trained for ALS transports, but Palmetto's equipment is

not suitable for ALS, as it is missing, and ambulances lack the ALS-required medications.

84.     For example, Palmetto transports cardiac patients, but Palmetto vehicles are not

equipped with heart monitors or the required medication bags.

85.     Palmetto ambulances sometimes have a black box, which is supposed to contain

controlled medication.  However, the box is locked and there is no key to open it, making it

useless if the controlled medication in the box were actually necessary.  To the extent that the

controlled medication is available, Palmetto staff do not keep proper logs of the inventory, and cannot access it.



**Figure 2. Locked black box in Palmetto's medicine kits**

86.    Palmetto bills CMS for ALS transports that are not medically necessary, and often times, that did not actually occur.

87.    For example, patient Patient 3 is a patient on a ventilator whom Palmetto picks up from his home in Fort Mill, SC, to medical facilities across the state border in Charlotte, NC. Patients on ventilators, like Patient 3, do not always require ALS transports.  However, Palmetto knowingly bills these transports as ALS transports, even if the services are not medically necessary or provided.

88.    When responding to ALS calls, Palmetto provides BLS transports, for which CMS' reimbursement is lower than ALS.  In order to receive a higher reimbursement from CMS, Palmetto bills some of its BLS transports as ALS.

89.    Palmetto's Rock Hill office receives approximately five ALS calls per week.

head

## VII.    SNIPES RAISES PALMETTO'S VIOLATIONS AND FACES RETALIATION

90.    In or about March 2015, Snipes learned that there was a transport call report in his chart for a transport call that Snipes had not run.

91.    Snipes approached Funderburke about this, and Funderburke took the report out of Snipes' chart.  Funderburke moved Snipes to the position of Quality Control Officer, a more administrative role that had Snipes spend more time in the office.

92.    On or about August 3, 2015, Snipes called the South Carolina Department of Health and Environmental Control to request an investigation of Palmetto.  He spoke with Jessica Smittle on August 3 and subsequently submitted a written summary on or about August 14, 2015.

93.    In or about the end of August 2015, Snipes asked Funderburke to run an activity report of all Snipes' transports.  These reports are often referred to as run reports, and they provide an explanation of the patients' condition, too.

94.    Snipes did this after learning that staff, mainly Tyler Covington and Caitlin Burnette, were entering false records into the billing system under Kelly Pour's account, one of Palmetto's managers.

95.    Funderburke asked Snipes to explain why he requested this run report, and Snipes explained that other staff were adding transports to Snipes' charts that Snipes did not run.

96.    Funderburke became angry and did not provide Snipes with the requested run report.

97.    A few days later, Palmetto stopped asking Snipes to run transport calls and he received no reply when he contacted Funderburke.

98.    It was when Snipes went to work next that Funderburke informed Snipes that he had been suspended.  Funderburke directed Snipes to contact Palmetto's corporate office in Augusta, GA to inquire further.

99.    On or about August 13, 2015, Snipes spoke on the telephone with Palmetto CEO Keith Stille.  Stille explained to Snipes that he had been suspended over failing to deliver his transport requests on time.

100.    On that phone call, Snipes told Stille that his transports were not reflected in the system.

101.    On or about August 31, 2015, Snipes requested a meeting with Palmetto officers to discuss Snipes' concerns.  The meeting was scheduled between COO Tom Stille and Snipes for September 9, 2015 in the Rock Hill location.

102.    Snipes related to Tom Stille that Palmetto was falsifying medical necessity certification forms and run reports, and not meeting the requisite vehicle standards.

103.    Tom Stille told Snipes that he would look further into this

104.    On or about September 18, 2015, without hearing back from Tom Stille about their September 9 conversation, Snipes received a letter from Keith Stille terminating Snipes' employment with Palmetto.

105.    Stille's letter cites "various findings" and "unprofessional conduct failing to complete run reports as required by policy subjecting Palmetto Ambulance Services to unnecessary liability" as the reasons for terminating Snipes' employment.

106.    Defendant Palmetto has actual knowledge of submitting false claims for payment to the Government and making and using false records to have false claims paid.  Despite Defendant's clear knowledge of its violations, Defendant persists in falsely billing the

Government for unperformed and inadequate services, and further, in taking action to retaliate against Snipes when he began to express concerns.

## COUNT I

### Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729(a)(1)(A)
### Knowingly Presenting or Causing to be Presented Claims for Payment
### to the United States

107.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

108.    Relator has first-hand knowledge of services that Palmetto billed to Medicare and Medicaid, which did not meet the criteria for Medicare and Medicaid, resulting in fraud.

109.    For each of the services described above, Palmetto submits claims to, and receives payment from, the United States of America through Medicare and Medicare's affiliated managed plans for the services provided to each Medicare beneficiary, or through a third-party insurer, despite the fact that the services did not meet Medicare requirements.  Specifically, Palmetto submits forms to CMS for ALS services, when in fact, no ALS services were provided. In doing these things, Palmetto defrauded millions of dollars from the Government when it submitted claims to Medicare for reimbursement

110.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations.  Palmetto knowingly made false claims in the form of reimbursement bills to officials of the United States for the purpose of obtaining compensation.

111.    Palmetto is aware of the non-compliant practices and has not taken action to accomplish compliance, which would substantially reduce profits.  In fact, Palmetto

affirmatively and knowingly submits false information about the medical necessity of ambulance services to claim that the services were covered under Medicare and Medicaid.

112.     The false claims Palmetto submits to the Government are material to the Government's decision or whether, and how much, to reimburse Palmetto for the services provided to Medicare and Medicaid beneficiaries.

<u>**COUNT II**</u>

<u>**Federal False Claims Act Claim pursuant to 31 U.S.C. § 3729(a)(1)(B)**</u>
<u>**Knowingly Making, or Causing to be Made a False Record Material to a**</u>
<u>**False Claims for Payment to the United States**</u>

113.     Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

114.     Palmetto knowingly makes or causes to be made false records or statements material to false or fraudulent claims in order to obtain payment or approval from the government, in violation of 31 U.S.C. § 3729(a)(1)(B).

115.     Palmetto makes, uses, or causes to be made or used, false records material to false claims by billing CMS for services that fail to meet CMS requirements.  Defendant makes and uses falsified medical necessity forms and patient charts information and run reports.  These false records are material to Defendant's false claims for payment from the Medicare and Medicaid program because they disguised the fact that the services for which the claims were submitted were not covered by the programs, and that no payments were due from the programs for such services.

116.     For each of the services described above, Palmetto submits claims to, and receives payment from, the United States of America through Medicare and Medicare's affiliated managed plans for the services provided to each Medicare beneficiary, or through a third-party

insurer, despite the fact that the services did not meet Medicare requirements and the underlying documentation is untrue.

117.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations.

118.    Palmetto is aware of the non-compliant practices and has not taken action to accomplish compliance, which would substantially reduce profits.  In fact, Palmetto affirmatively and knowingly makes, uses, or causes to be used, false information about the medical necessity of ambulance services to claim that the services were covered under Medicare and Medicaid.

119.    The false claims Palmetto submits to the Government are material to the Government's decision or whether, and how much, to reimburse Palmetto for the services provided to Medicare and Medicaid beneficiaries.

## COUNT III

### Federal False Claims Act Pursuant to 31 U.S.C. § 3730(h) for Relief From Retaliatory Actions

120.    Relator reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

121.    Relator was an employee as defined in the FCA.

122.    Palmetto is an employer as defined in the FCA.

123.    Palmetto retaliated against Relator in violation of 31 U.S.C. § 3730(h) when Palmetto demoted Relator to a quality control position in the office, and later, when it terminated him.

124.    Relator engaged in protected activity when he expressed his concerns to Funderburke about the medical records and to Palmetto's CEO.

125.    Defendant terminated Snipes shortly thereafter.

126.    There is a causal link between Relator's protected activity and the adverse personnel actions.

127.    Relator has been damaged by Palmetto's retaliatory actions and is entitled to all relief necessary to make Relator whole.

## PRAYER FOR RELIEF

WHEREFORE, the Relator Wesley Snipes, acting on behalf of and in the name of the United States of America, and on his own behalf, prays that judgment be entered against Defendants for violation of the False Claims Act as follows:

(a)    In favor of the United States against the Defendant for the amount of the false claims submitted by Defendant, treble damages to the Federal Government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Acts;

(b)    In favor of the Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) to include reasonable expenses, attorney fees, and costs incurred by the Relator;

(c)    For all costs of the False Claims Act civil action; and

(d)    In favor of Relator for all compensatory and punitive damages, including personal injury damages for pain and suffering, emotional distress, and loss of reputation, back

pay, and interest, and attorney's fees and costs to which he is entitled under 31 U.S.C. § 3730(h); and

(e)      In favor of the Relator and the United States for further relief as this court deems just and equitable.

Respectfully submitted,


s/ John C. Moylan_____
John C. Moylan (Federal Bar # 5431)
**Wyche, P.A.**
801 Gervais Street, Suite B
Columbia, SC 29201
(803) 254-6542
(803) 254-6544 (facsimile)
jmoylan@wyche.com
*Local Counsel for Plaintiff-Relator*


R. Scott Oswald, *to be admitted pro hac vice*
David L. Scher *to be admitted pro hac vice*
The Employment Law Group, P.C.
888 17th Street, N.W., 9th Floor
Washington, D.C. 20006
(202) 261 – 2810
(202) 261 – 2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com
*Counsel for Plaintiff-Relator*

February 29, 2016